IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| MICHAEL REIS, SR.,<br>941 Ann Road<br>Naperville, IL  60540 | : <br> : <br> : <br> : | |
| LAWRENCE J. KATZ<br>11 Minuteman Court<br>Basking Ridge, NJ  07920 | : <br> : <br> : | CIVIL ACTION NO. |
| on their own behalf; and as Assignees<br>of Weaver Nut Company, Inc. | : <br> : <br> : <br> : | |
| v. | : <br> : | |
| BARLEY, SNYDER, SENFT & COHEN LLC.<br>126 East King Street<br>Lancaster, PA  17608-3126 | : <br> : <br> : | |

## COMPLAINT

Plaintiffs Michael Reis, Sr., Lawrence J. Katz on their own behalf and as

assignees of Weaver Nut Company, Inc. hereby file this action and aver as follows:

## Parties

1.      Plaintiff Michael Reis, Sr. ("Mr. Reis"), was a twenty-five percent (25%)

shareholder of Weaver Nut Company Inc. (the "Company") from June 12, 2001 to December 15,

2003.  Reis was formerly Secretary, Treasurer and Chief Financial Officer of the Company.  Reis

resides at 941 Ann Road, Naperville, IL 60540.

2.      Plaintiff Lawrence J. Katz ("Mr. Katz") was a twenty-five percent (25%)

shareholder of Weaver Nut Company, Inc. from June 12, 2001 to December 15, 2003.  Katz

secured a funding source to provide corporate restructuring and financial management advice to

the Company.  Katz resides at 11 Minutemen Court, Basking Ridge, NJ 07920.

3.      On December 14, 2003 the Company assigned any claims it had against Barley Snyder and its attorneys to Mr. Reis and Mr. Katz.

4.      All rights of the Company in this action were assigned to plaintiffs, therefore the Company has no right to commence this action on its own.

5.      Defendant Barley, Snyder, Senft & Cohen LLC ("Barley Snyder") is a law firm registered as a Pennsylvania limited liability company employing licensed professionals with a business address at 126 East King Street, Lancaster, Pennsylvania 17608-3126 which acts by and through its attorneys.  Plaintiff is asserting a professional liability claim against this defendant.

6.      Barley Snyder advertises its experience in minority shareholder disputes and litigation involving closely held corporations.  It asserts it is expert in the area of business and corporate law and litigation.  It also advertises that its attorneys are ethical, reasonable and practical and operate under a set of Service Excellence Guidelines.  The firm web site asserts that the firm places great emphasis on a full understanding of the needs and objectives of its clients.

### Jurisdiction and Venue

7.      The United States District Court for the Eastern District of Pennsylvania has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1332 (diversity jurisdiction) because it is between citizens of different states and the amount in controversy exceeds $250,000, exclusive of interest and costs.

8.      Venue is proper in the Eastern District of Pennsylvania pursuant to 28 U.S.C. §§ 1391(b)(1) and (b)(2) because defendant conducts business in this judicial district and because a substantial part of the acts and/or omissions giving rise to the claims set forth herein occurred in this judicial district.

9.      The plaintiffs in this case are citizens of Illinois and New Jersey, and the defendant is a Pennsylvania limited liability company.

### Factual Background

10.      Weaver Nut Company, Inc. is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 1925 West Main Street, Ephrata, Pennsylvania.  The Company is a distributor of candies, nuts and dried fruits in the retail and wholesale markets.

11.      In 2002 and early 2003, the relevant time period of this complaint, and during the time when Mr. Reis and Mr. Katz were involved with the Company, the Company had approximately 40 employees and revenues of $12.3 million.

12.      However, five years ago, in the year 2000, when the Company was owned exclusively by E. Paul Weaver III ("Weaver III") and Miriam J. Weaver, his wife, the Company was in significant financial trouble, losing over a half million dollars, owing to the mismanagement of Weaver III.

13.      The Company was also in default of its loan agreements, numerous forbearance agreements with its bank and in default of its vendor relationships.  It was unable to repay a $1.6 million line of credit.

14.      After the Company had breached multiple forbearance agreements with its bank, in or about 2001 the bank exercised its rights under its security agreements and appointed a trustee over the Company's affairs.

15.      The trustee explored options to reduce the bank's exposure to the Company.  One option it explored was to locate a firm that would acquire an interest in Weaver Nut Company, and assist the Company to pay off the outstanding loans owed to the bank.

16.     The trustee became aware of a firm affiliated with Mr. Katz and Mr. Reis. In order to achieve the goal of resolving the Company's problems with its bank, the Company, through Weaver III subsequently entered into a Merchant Banking and Corporate Development Agreement on June 12, 2001 ("Development Agreement") with that firm.  A true and correct copy of this document is attached hereto as Exhibit 1.  With Mr. Reis' and Mr. Katz' help, the Company was able to restructure its debt, obtain a new line of credit and continue in business. Without this joint venture, the Company would have been liquidated because it was not viable as an ongoing concern under Weaver III's leadership.

17.     The Company passed a corporate resolution ratifying the Development Agreement which provided in pertinent part that the Development Agreement was for the [Company's] benefit. (Exhibit 2)

18.     Mr. Katz and Mr. Reis became 50% shareholders of the Company pursuant to warrants granted by the Company, as consideration for services rendered in connection with the Development Agreement.  The warrants were exercised as of June 12, 2001. Weaver III and Miriam Weaver kept the remaining 50% of the shares of the Company.

19.     The fundamental responsibilities under the Development Agreement were (1) to secure financing for the Company to replace the bank line of credit; (2) assist the Company with restructuring solutions and corporate revitalization and (3) to explore strategic merger/acquisition opportunities for the Company in the candy/nut distribution and retail business.

20.     In order to achieve these goals, pursuant to the Development Agreement, the Company gave broad authority to participate in the management of, and improve the financial condition of Weaver Nut Company, including but not limited to:

         a.        authority to negotiate with creditors, customers and employees;

         b.        authority to hire and fire employees; and

         c.        access to all Company books and records.

21.     In recognition of this broad authority, Mr. Reis was made CFO of the Company, and was elected Secretary and Treasurer of the Company.

22.     Under the Development Agreement, which was ongoing and not to be terminated unless in writing, the firm associated with Mr. Katz and Mr. Reis as well as Mr. Katz and Mr. Reis themselves were entitled to certain compensation in consideration of services to be performed including:

         a.        five percent financing fee to be paid at closing of all new corporate financing transactions;

         b.        four percent strategic financing fee to be paid at closing of any merger/acquisition or similar strategic transaction;

         c.        annual financial management advisory fee of $75,0000 for the firm and $105,000 for Reis, plus $10,000 each for expenses.

23.     As a direct result of this assistance and restructuring, from August 30, 2001, to late 2003, the Company was refinanced through a factoring/commercial finance company located in Dallas, Texas.  That finance company then provided a revolving line of credit in excess of one million dollars and secured it with a security interest in the Company's accounts receivable.  The Company was to instruct its customers to make payments to a lock box controlled by the finance company.

24.     Mr. Katz and Mr. Reis diligently and successfully performed their duties under the Development Agreement including implementing management policies, systems and controls that dramatically improved the Company's profitability in less than two years, and diligently pursued strategic merger/acquisition opportunities:  for example they closed a sale and

lease-back of the Company warehouse to generate cash; they obtained a $1.5 million revolving line of credit for working capital; they hired competent senior managers and implemented a state of the art inventory control system.

25.    A key factor in the successful turnaround of the Company was the continuing effort to eliminate or at least minimize Weaver III's unsound business practices, including:  below-cost sales to customers, irrational purchasing without regard to existing inventory and anticipated demand, sale of "out-of-date" inventory as current product, misleading marketing techniques, questionable self-dealing and related-party transactions, and maintenance of a hostile workplace.  Mr. Katz' and Mr. Reis' efforts in that regard were ongoing in the beginning of 2003.

26.    By the beginning of 2003, as a result of the efforts of Mr. Katz and Mr. Reis, Weaver Nut Company was operating at a profit, after losing a million dollars in 1999-2000.

27.    In the beginning of 2003 the marketability of the Company was in excess of $6,000,000 and it was on track to achieve a $1,500,000 operating profit without any add-on acquisitions.

28.    At or about this same time, Weaver III began secret discussions with Barley Snyder and its attorneys about the future of the Company.  Mr. Reis and Mr. Katz did not know about these discussions.

29.    In January 2003, Mr. Reis and Mr. Katz met with Frank McSorley and Paul Weaver IV (the son of Weaver III), the owners of Packaged Foods Inc. ("Packaged Foods"), to discuss the failure to pay a $100,000 Note given to Packaged Foods by the Company.  Packaged Foods was a spin-off of the Weaver Nut Company packaging department and the Note was given when the spin off occurred on August 31, 2001.  In addition, $82,000 in accounts

receivable had also been converted to a Note due the Company, and that too remained unpaid.

Packaged Foods by then had become a competitor as well as a customer of the Company.

30.     McSorley and Weaver IV of Packaged Foods told Mr. Reis and Mr. Katz

that attorneys at Barley Snyder advised them that the UCC filed by the Company to secure the

Notes was unenforceable.

31.     On January 9, 2003, the Company notified Packaged Foods that it was

exercising its rights of reclamation in the product and equipment secured by the UCC-1.

32.     On January 27, 2003, apparently knowing of the issues between the

Company and Packaged Foods, Stephen D. Flaherty, an attorney at Barley Snyder, sent a letter to

several attorneys, including then-counsel for Weaver Nut Company, on behalf of its client Ted

Baxter, offering to purchase certain assets of Packaged Foods.  Mr. Baxter formed Manna Foods

to complete this purchase.  Manna Foods intended to become a competitor of the Company.

(Exhibit 3)

33.     With the turnaround of Weaver Nut Company successfully underway in

2003 through the efforts of Mr. Reis and Mr. Katz, it is believed and therefore averred that

Weaver III in conjunction with Barley Snyder attorneys, decided the Company no longer needed

Mr. Reis or Mr. Katz.

34.     In early 2003 Weaver III and John Maksel met with Barley Snyder

attorneys.  Maksel later became the new CFO of the Company.

35.     At or about the same time, Weaver III retained Barley Snyder attorneys as

counsel for himself and the Company and, it is believed and therefore averred, paid the retainer

from Company funds.  Neither Mr. Reis nor Mr. Katz as 50% shareholders of the Company and

key to the success of the Development Agreement, knew about or approved this retention, nor

did they waive any conflict with Barley Snyder's advice to and representation of Company competitors Packaged Foods or Manna Foods.

36.     Manna Foods represented by Barley Snyder completed the purchase of the assets of Packaged Foods in April 2003 and Packaged Foods with, it is believed and therefore averred, the knowledge and advice of Barley Snyder, failed to pay the Notes due to the Company at that time.

37.     Barley Snyder attorneys then worked with Weaver III to escape the obligations of the very Development Agreement that had saved the Company and was making it profitable, all to the great detriment of the Company, and to obtain large legal fees for themselves.

38.     One employee of the Company learned from a Barley Snyder attorney that the Company was the largest billable client Barley Snyder had.

39.     Barley Snyder and its attorneys were aware of the Development Agreement among the Company, Weaver III, Mr. Reis and Mr. Katz and its restrictions and requirements, but failed to investigate whether actions taken by Barley Snyder attorneys would be detrimental to its other client, the Company, or to the detriment of Mr. Reis and Mr. Katz and to the advantage of Weaver III.

40.     On April 11, 2003, a Barley Snyder attorney, Shawn M. Long, purporting to act on behalf of the Company and Weaver III, terminated the Development Agreement, in blatant violation of paragraphs 13 and 16 of that Agreement, fired Mr. Reis as Company CFO and soon after terminated key members of the management team put into place by Mr. Reis and Mr. Katz.  That termination letter was copied to Barley Snyder attorneys Paul G. Mattaini, a partner and Matthew H. Haverstick, an associate.  (Exhibit 4)

41.     Barley Snyder and its attorneys should have investigated the impact of its actions on its client the Company prior to acting in concert with Weaver III who had fiduciary duties to Mr. Reis and Mr. Katz.

42.     Barley Snyder and its attorneys took action on behalf of Weaver III and/or the Company without consulting 50% shareholders Mr. Reis and Mr. Katz.

43.     Also on April 11, 2003, acting on behalf of the Company, Barley Snyder threatened Mr. Reis and Mr. Katz with criminal sanctions if they entered the Company's premises again.  Those threats have never been withdrawn.

44.     By terminating Mr. Reis and Mr. Katz, Barley Snyder and its attorneys put the Company in violation of the Development Agreement and caused the finances of the Company to be negatively affected.  Credit extensions were reviewed and altered to the detriment of the Company.

45.     Weaver III, acting on the advice of Barley Snyder attorneys, terminated other key Company personnel hired by Mr. Reis, putting the Company in disarray.  The Company financing was put into jeopardy.

46.     Barley Snyder attorneys had to go to Texas to try to renegotiate the terms of the Company financing, which was in violation of the Development Agreement that required the financing company be contacted only by the firm affiliated with Mr. Reis and Mr. Katz.

47.     Subsequent to the firings of key management, various consultants were hired with the assistance and direction of Barley Snyder attorneys and those consultants took direction from Barley Snyder.  The consultants were paid large sums with Company funds, and were unable to properly operate the Company.

48.     Other employees who filled positions vacated by the terminations took direction directly from Barley Snyder attorneys and complained that the Company was in disarray.

49.     The Company suffered.  Its accounts payable increased to over a million dollars, follow-on funding advances were obtained at what are believed to be unfavorable rates, deliveries could not be made because product could not be purchased without cash availability, the Company computer system was compromised by staff terminations so that the ability of the Company to track its financial position was impaired, experienced staff was replaced by inexperienced consultants and personnel all of which reduced the equity of the Company by millions of dollars.

50.     Weaver III, with it is believed and therefore averred, the advice and assistance of Barley Snyder attorneys, opened a new bank account and changed the address on the purchase orders from the outside inventory financing firm to the address for the Company, in violation of the Company's financing agreement.  Tens of thousands of dollars were diverted.

51.     On April 24, 2003, Mr. Reis and Mr. Katz were notified that Frank McSorley, formerly of competitor Packaged Foods, was now top management at the Company.

52.     On May 6, 2003 Mr. Reis and Mr. Katz were notified that legal fees for both Weaver III and the Company were paid to Barley Snyder from Company funds.  Various consultants were also paid from Company funds.  Mr. Reis and Mr. Katz as 50% shareholders did not approve the expenditures to Barley Snyder.

53.     Mr. Reis and Mr. Katz later learned that Barley Snyder attorneys advised the Company to deduct the personal legal fees paid to Barley Snyder by the Company for Weaver III to be deducted from what is believed and therefore averred to be Weaver's fictitious

"Due to Officer" account.  This resulted in the Company paying Weaver's personal legal fees to Barley Snyder. The failure to expense fees on a current basis also affected profit and loss.

54.     After Mr. Reis and Mr. Katz complained about Barley Snyder's representations of both Weaver III and the Company, Barley Snyder enlisted another attorney to serve as counsel to the Company, but the damage had already been done.  That attorney took direction from Barley Snyder instead of acting independently.  That attorney was also paid from Company funds.

55.     Barley Snyder never disclosed the conflict with its representation of Packaged Foods and Manna Foods, companies in direct competition with Weaver Nut Company. These conflicts were never waived.

56.     Barley Snyder attorneys knew or should have known that the only time the Company was profitable was under the leadership of Mr. Reis and Mr. Katz and returning it to the sole management of Weaver III caused harm to the Company and its shareholders.

57.     The harm to plaintiffs would not have occurred but for Barley Snyder's legal negligence.

58.     Barley Snyder failed to exercise ordinary skill and knowledge and failed to exercise due diligence by directing and assisting Weaver III in breaching fiduciary duties to Mr. Reis, Mr. Katz and the Company.

59.     On December 15, 2003 Mr. Reis and Mr. Katz settled their differences with Weaver III and returned their shares to the Company which transferred back to Mr. Reis and Mr. Katz any claims against Barley Snyder they had as shareholders of the Company.  At the same time, the Company's claims against Barley Snyder were assigned to Mr. Reis and Mr. Katz.

## COUNT I
## BREACH OF FIDUCIARY DUTY

60.     Paragraphs 1 through 59 above are incorporated herein by reference

61.     Mr. Reis and Mr. Katz were engaged to take primary charge of management of the Company to rehabilitate the company financially and in return they were to receive substantial financial benefits.

62.     The Company was the beneficiary of this arrangement.

63.     Defendant undertook to represent Weaver III and the Company and participated in maneuvers that ousted Mr. Reis and Mr. Katz followed by installation of new management.

64.     Defendant owed a duty to plaintiffs to use care in its representation of Weaver III who was a fiduciary who should have acted in the best interests of the Company.

65.     The Company suffered as a consequence and Mr. Reis and Mr. Katz suffered substantial financial losses as an additional consequence.

66.     Defendant had a conflict of interest in assisting Weaver III to the disadvantage of its other client, the Company.

67.     Defendant assisted Weaver III in violation of fiduciary duties he owed to Mr. Reis and Mr. Katz under the Development Agreement, the joint venture among them.

68.     Defendant was on notice that Weaver III had fiduciary duties but assisted him in conduct that violated those duties.

69.     Defendant conducted no due diligence to determine whether Weaver III was violating fiduciary duties.

70.     Such a duty to use care would not have significantly impaired the performance of Barley Snyder's obligations.

71.     As attorneys maintaining control of Weaver Nut Company through the aforesaid means, defendant owed the shareholders of the Company as well as the Company itself a fiduciary duty to serve the Company in a loyal and non-negligent manner for the benefit of all shareholders collectively.

72.     The defendant has willfully and deliberately assisted in the breach of fiduciary duties owed to the plaintiffs and to the Company by the following practices, which are not inclusive but solely for purposes of illustration:

       a.     Misappropriating corporate assets by engaging in transactions including directing payment of excessive legal fees and directing payment of Weaver III's personal attorney fees and costs from the Company's cash;

       b.     Directing the unilateral firing, without any cause or justification and without any proper authority, the most critical and vital employee assets including the office manager, the warehouse manager, the general manager, and the Treasurer, Secretary and Chief Financial Officer without which the Company could not function or survive given its technology infrastructure and financial management system which was used on a daily basis to operate the business;

       c.     Improperly terminating the Development Agreement under which the Company was provided with invaluable operating capital resources and financial expertise;

       d.     Directing the violation of loan covenants;

       e.     Representing direct competitors of the Company at the same time it represented the Company without disclosing a conflict or seeking a waiver of the conflict in representation;

       f.     Engineering the sale of corporate assets of the Company to a debtor of the Company and later to another client of the law firm which was a direct competitor of the Company.

73.     Defendant also breached its fiduciary duty to the Company by using confidential Company information to benefit the Company's competitors and causing financial

harm to the Company while collecting large legal fees from the Company for the benefit of defendant.

74.     As a result of the foregoing breaches of fiduciary duties, Mr. Katz and Mr. Reis and the Company have suffered foreseeable direct and consequential damages in an amount far in excess of $1,000,000 including but not limited to (1) loss of monthly advisory fees totaling $15,384 for each month from April 2003 forward; (2) unpaid fees for the original $1,500,000 KBK financing and computer equipment of $73,250; (3) expenditures by the Company for consultants recommended by Barley Snyder; (4) expenditures for legal fees incurred by the Company and E. Paul Weaver III personally and paid to Barley Snyder from Company funds; (5) diminution in value of the Company as a result of Barley Snyder's use of the Company's confidential business information to benefit other Barley Snyder clients; (6) loss of at least 50% of the value of the Company amounting to approximately $700,000 as of April 11, 2003; (7) other consequential damages; and (8) prejudgment interest.

75.     The Company has also suffered direct damages far in excess of one million dollars, including but not limited to the ability of the Company to be highly profitable with an experienced management team and to compete in the marketplace free of concern that confidential Company information was being transmitted to direct competitors.

76.     The conduct of defendant was deliberate, willful, wanton, and outrageous, entitling plaintiffs to an award of punitive damages.

WHEREFORE, plaintiffs Michael Reis and Lawrence Katz respectfully request judgment in their favor and against Barley Snyder for damages in excess of $250,000 proximately caused by defendant's breaches of fiduciary duty, along with punitive damages,

attorneys' fees as allowed by law, delay damages, costs and such other relief as the Court may deem appropriate.

## COUNT II
## PROFESSIONAL NEGLIGENCE

77.    Paragraphs 1 through 76 above are incorporated herein by reference.

78.    Defendant was employed by Weaver III and the Company and defendant owed a duty to the Company and all of its shareholders.

79.    Defendant had a conflict of interest in assisting Weaver III to the disadvantage of its other client, the Company and assisted Weaver III in violation of fiduciary duties he owed to Mr. Reis and Mr. Katz under the agreement for the joint venture between them.

80.    Defendant was on notice that Weaver III had fiduciary duties and should not have assisted him in conduct that violated such duties in the absence of having conducted an adequate due diligence to determine whether the client is violating those duties.

81.    Defendant did not conduct adequate due diligence.

82.    Defendant failed to exercise ordinary skill and knowledge.

83.    Such negligence by Barley Snyder was the proximate cause of damage to the plaintiffs.

84.    Damages as set forth above were suffered by plaintiffs.

WHEREFORE plaintiffs Lawrence J. Katz and Michael Reis respectfully request that this Court award damages in an amount in excess of $250,000.

## COUNT III
## ABUSE OF PROCESS

85.    Paragraphs 1 through 84 above are incorporated herein by reference.

86.     Defendant took part in the procurement, initiation and continuation of civil proceedings, including but not limited to an injunction action against plaintiffs and is subject to liability.

87.     Defendant acted in a grossly negligent manner and/or without probable cause and primarily for a purpose other than that of securing the adjudication of the claim on which the proceedings were based.

88.     Defendant used that legal process to accomplish a purpose for which the process was not designed in that suits were filed against plaintiffs to put pressure on them to compel them to give up their interests in the Company in part so that Weaver III and Barley Snyder would benefit monetarily to the detriment of plaintiffs.

89.     Defendant showed reckless indifference to the rights of plaintiffs and its actions were of such outrageous character as to demonstrate intentional, willful, malicious, wanton and reckless conduct.

90.     Defendant also used that legal process intending to harass plaintiffs as its primary motivation.

91.     Plaintiffs were defamed by the actions of Barley Snyder.

92.     Plaintiffs suffered emotional distress.

93.     Defendant interfered with plaintiffs' advantageous use of their interests in the Company.

94.     Plaintiffs have suffered damages as set forth, including loss of income pursuant to the Development Agreement, loss of value of their interests in the Company, harm to their reputations, expenses incurred in defending themselves against the proceedings including attorney fees and emotional distress caused by the proceedings.

95.     The initiation of the litigation against plaintiffs was arbitrary, vexatious and in bad faith.

96.     Based on the facts of this case, punitive damages are appropriate.

WHEREFORE plaintiffs Lawrence J. Katz and Michael Reis respectfully request that this Court award compensatory damages, punitive damages and attorney fees and costs in an amount in excess of $250,000.

## COUNT IV

## INTERFERENCE WITH A CONTRACTUAL RELATIONSHIP

97.     Paragraphs 1 through 96 above are incorporated herein by reference.

98.     A contract existed between plaintiffs and the Company, that is, the Development Agreement as described in this complaint.

99.     Defendant purposefully acted specifically intending to harm the existing relationship between plaintiffs and the Company.

100.    Defendant had no privilege or justification for its acts.

101.    Plaintiffs suffered actual legal damages as a result of Barley Snyder's conduct as set forth above.

WHEREFORE plaintiffs Lawrence J. Katz and Michael Reis respectfully request that this Court award damages in an amount in excess of $250,000.

## COUNT V

## CONVERSION

102.    Paragraphs 1 through 101 above are incorporated herein by reference.

103.    Defendant interfered with plaintiffs' ownership and/or right to possession of their interests in the Company.

104.    Defendant interfered through its wrongful control of plaintiffs' property without justification or plaintiff's consent.

105.    Defendant intended to seize plaintiffs' property.

106.    Plaintiffs had contractual rights giving possessory interest in their property.

107.    Plaintiffs suffered actual damage as set forth above.

WHEREFORE plaintiffs Lawrence J. Katz and Michael Reis respectfully request that this Court award compensatory damages, punitive damages and attorney fees and costs in an amount in excess of $250,000.

Respectfully submitted,


_____**LBW227**_____
Lynanne B. Wescott, Esquire
Pa. Attorney I.D. No. 52928
The Wescott Law Firm P.C.
239 S. Camac Street
Philadelphia, PA  19107
(215) 545-0324


Dated: ___4/10/05_____

## <u>CERTIFICATE OF MERIT</u>

An appropriate licensed professional, Geoffrey C. Hazard, Jr. Esquire, has supplied a written statement in accordance with Pa. R. Civ. P. 1042.3 (a) to the effect that there exists a reasonable probability that the care, skill or knowledge exercised or exhibited in the treatment, practice or work that is the subject of this complaint fell outside acceptable professional standards and that such conduct was a cause in bringing about the harm; this claim against Barley Snyder is based on allegations that licensed professionals for whom it is responsible deviated from an acceptable professional standard.


_____LBW227_____
Lynanne B. Wescott