<u>IN THE UNITED STATES DISTRICT COURT</u>
<u>FOR THE EASTERN DISTRICT OF PENNSYLVANIA</u>

```
MICHAEL REIS, SR. and           )
LAWRENCE J. KATZ, on Their Own  )  Civil Action
Behalf and as Assignees of      )  No. 05-CV-01651
Weaver Nut Company, Inc.,       )
                                )
          Plaintiffs            )
                                )
        vs.                     )
                                )
BARLEY, SNYDER, SENFT           )
& COHEN LLC.,                   )
                                )
          Defendant             )
```

                              *    *    *

APPEARANCES:

            LYNANNE B. WESCOTT, ESQUIRE
                 On behalf of Plaintiffs

            ARTHUR W. LEFCO, ESQUIRE
            AARON E. MOORE, ESQUIRE
                 On behalf of Defendant

                         *    *    *

              <u>A D J U D I C A T I O N</u>

JAMES KNOLL GARDNER,
United States District Judge

        The undersigned presided over a 35-day non-jury trial[1]

in this matter on July 7-9, 11, 16-18, 21-23, 25, 28-29,

August 6-8, 11-15, September 9-12, 18, 23-26, November 14, 2008,

January 13-15 and 27, 2009.

        There are six claims in plaintiff's Amended Complaint

for adjudication, brought by plaintiffs Michael Reis, Sr. and

---

        [1]    By my Memorandum and Order dated March 27, 2008, I granted the
Motion of Defendant, Barley Snyder, LLC to Strike Plaintiffs' Demand for Jury
Trial, which motion was filed July 13, 2007.

Lawrence J. Katz in either their individual capacity or as assignees of the rights of Weaver Nut Company, Inc. against defendant Barley, Snyder, Senft & Cohen, LLC.  They are as follows:

Count I: (1) breach of fiduciary duty brought by plaintiffs Reis and Katz as assignees of the rights of Weaver Nut Company, Inc. ("Company"); (2) aiding and abetting breach of a fiduciary duty brought by Reis and Katz individually; and (3) aiding and abetting breach of a fiduciary duty brought by Reis and Katz as assignees of the Company.

Count II:  (4) professional negligence against Barley Snyder, brought by Reis and Katz as assignees of the Company.

Count IV:  (5) tortious interference with contractual relations against Barley Snyder, brought by Reis and Katz as assignees of the Company.

Count VI:  (6) breach of contract brought against defendant Barley Snyder by plaintiffs Reis and Katz in their capacity as assignees of the rights of the Company.

For the reasons expressed below, I now find in favor of defendant Barley, Snyder, Senft & Cohen, LLC and against plaintiffs Michael Reis, Sr. and Lawrence J. Katz on all six claims.

JURISDICTION

This action is before the court on diversity jurisdiction.  Plaintiff Michael Reis, Sr. is a resident of the State of Illinois and plaintiff Lawrence J. Katz is a resident of the State of New Jersey.  Defendant Barley, Snyder, Senft & Cohen, LLC is a Pennsylvania limited liability company.  The amount in controversy is in excess of $75,000.  See 28 U.S.C. § 1332.

VENUE

Venue is proper because plaintiffs allege that the facts and circumstances giving rise to the cause of action occurred in Lancaster County, Pennsylvania, which is in this judicial district. 28 U.S.C. §§ 118, 1391.

SUMMARY OF DECISION

Regarding Count I of plaintiffs' Amended Complaint[2], I find in favor of defendant on plaintiffs' claim for breach of fiduciary duty brought by plaintiffs Reis and Katz as assignees of the rights of the Company.  Specifically, I conclude that Barley Snyder did have a fiduciary duty to its client Weaver Nut Company which demanded undivided loyalty and prohibited Barley Snyder from engaging in conflicts of interest.  A breach of such duty is actionable.  However, I conclude that Barley Snyder

---

[2]    All Counts discussed are counts in plaintiffs' Amended Complaint filed April 12, 2006.

neither breached its duty of loyalty to Weaver Nut Company nor engaged in any other conflict of interest.

In addition, regarding the two other claims contained in Count I, aiding and abetting breach of a fiduciary duty brought by Reis and Katz individually, and aiding and abetting breach of a fiduciary duty brought by Reis and Katz as assignees of the Company, I conclude that E. Paul Weaver, III, as President of Weaver Nut Company owed fiduciary duties to Mr. Reis, Mr. Katz and the Company, which he breached.

However, I conclude that plaintiffs failed to prove by a preponderance of the evidence that Barley Snyder either had knowledge of the breach by Mr. Weaver, or provided substantial assistance or encouragement to Mr. Weaver.  Rather, I conclude that based upon the information provided to Barley Snyder, the firm acted both legally, ethically, and in good faith, concerning both of its clients (the Weavers and the Company).

Regarding Count II alleging professional negligence against Barley Snyder, brought by Reis and Katz as assignees of the Company, I conclude that plaintiffs have failed to establish by a preponderance of the evidence that Barley Snyder failed to exercise the ordinary skill and knowledge that attorneys are required to utilize or that there are any damages owing to the Company as a result of the actions of Barley Snyder.

Regarding Count IV alleging tortious interference with contractual relations against Barley Snyder, brought by Reis and Katz as assignees of the Company, I conclude that a contract existed, but defendant did not take purposeful action specifically intended to harm the existing relation because the law firm was the agent of the Company.  Moreover, I conclude that there was either privilege, legal justification, or both, for the actions taken by defendant.  Also, I conclude that plaintiffs have failed to establish damages on count IV by a preponderance of the evidence.

Finally, Count VI alleges breach of contract for the professional services rendered to Weaver Nut Company, brought by plaintiffs Reis and Katz in their capacity as assignees of the rights of the Company.  I conclude that there was a contract between the Company and Barley Snyder for legal services, but that the contract was not breached by Barley Snyder.  Moreover, plaintiffs have failed to establish by a preponderance of the evidence that the Company suffered any damages under the contract.

PROCEDURAL HISTORY

On April 10, 2005 plaintiffs Reis and Katz, on their own behalf and as assignees of Weaver Nut Company, Inc., filed their initial Complaint in this matter.  The original Complaint alleged the five following causes of action: breach of fiduciary

duty (Count I); professional negligence (Count II); abuse of process (Count III); interference with a contractual relationship (Count IV); and conversion (Count V).

On June 23, 2005 defendant filed its initial motion to dismiss. On July 7, 2005 plaintiffs responded, which included a request to amend the Complaint. My Order dated March 17, 2006 and filed March 20, 2006 granted plaintiffs' request.

On April 12, 2006 plaintiffs filed their Amended Complaint. The Amended Complaint contains the original five causes of action and an additional cause of action for breach of contract (Count VI). On May 2, 2006 defendants filed their second motion to dismiss. On May 19, 2006 plaintiffs responded. Oral argument was conducted before me on November 28, 2006. The matter was taken under advisement at the conclusion of oral argument on November 28, 2006.

By my Order and Opinion dated March 30, 2007 I granted in part and denied in part defendant's motion to dismiss plaintiffs' Amended Complaint.

Specifically, for reasons articulated in the Opinion, I granted defendant's motion to dismiss that portion of Count I of plaintiffs' Amended Complaint brought by plaintiffs Reis and Katz, in their individual capacities, alleging a breach of fiduciary duty by defendant law firm.

Also, I granted defendant's motion to dismiss that portion of Count II alleging a claim of professional negligence against defendant Barley Snyder, brought by plaintiffs Reis and Katz, individually.

I granted defendant's motion to dismiss Count III of plaintiffs' Amended Complaint alleging a cause of action against defendant for abuse of process brought by plaintiffs Reis and Katz in their individual capacities.

Moreover, I granted defendant's motion and dismissed from Count IV of the Amended Complaint the claims of Reis and Katz, individually, alleging tortious interference with contractual relations by defendant.

Finally, I granted defendant's motion to dismiss Count V of plaintiffs' Amended Complaint alleging a cause of action against Barley Snyder for conversion brought by plaintiffs Reis and Katz in their individual capacities.

The claims which remain are those set forth in the second paragraph of this Adjudication.

By Memorandum and Order dated March 28, 2008, and for the reasons expressed in the Memorandum, I granted the Motion of Defendant, Barley Snyder, LLC, to Strike Plaintiffs' Demand for a Jury Trial, denied plaintiffs' Countermotion Pursuant to Federal Rule of Civil Procedure 39 and struck plaintiffs' Demand for Jury

Trial filed June 29, 2007.  Thus, this matter was tried before the court, not a jury.

By Order dated July 3, 2008 I denied defendant's motion for summary judgment because I found there were numerous genuine issues of material fact placed on the record by me on that date.

<u>FINDINGS OF FACT</u>[3]

Based upon the testimony and evidence adduced at trial,[4] the pleadings, record papers and the parties' post-trial submissions, I make the following Findings of Fact.

> 1.   Plaintiff Lawrence J. Katz is an individual who resides at 11 Minuteman Court, Basking Ridge, New Jersey.  Mr. Katz's background is in merchant banking, investment banking and commercial finance focused on special situations or companies that are in distress or in a restructuring mode.
>
> 2.   Plaintiff Michael Reis, Sr., is an individual who resides at 941 Ann Road, Naperville, Illinois.  Mr. Reis' background is in accounting.  However, Mr. Reis is neither a public accountant, nor a certified public accountant.
>
> 3.   Defendant Barley, Snyder, Senft & Cohen LLC ("Barley Snyder") is a law firm registered as a Pennsylvania limited liability company employing

---

[3]     My Findings of Fact incorporate the relevant facts agreed to by the parties as reflected in the Amended Agreed Statement of Facts and Conclusions of Law to Add Cites to the Record, which document was filed January 24, 2009.

[4]     The Findings of Fact reflect my credibility determinations regarding the testimony and evidence presented at trial.  Credibility determinations are within the sole province of the finder of fact, in this case the court.  Fed.R.Civ.P. 52; <u>See, e.g.</u> <u>Icicle Seafoods, Inc. v. Worthington</u>, 475 U.S. 709, 715, 106 S.Ct. 1527, 1530, 89 L.Ed.2d 739, 745 (1986).  Implicit in my findings is the conclusion that I found the testimony of some witnesses credible in whole, some in part, and have rejected portions of testimony of certain witnesses, as more fully explained in my discussion.

licensed professionals with a business address at 126 East King Street, Lancaster, Pennsylvania.

4.  Weaver Nut Company, Inc. ("Weaver Nut Company" or "Company") is a business corporation organized and existing under the laws of the Commonwealth of Pennsylvania with a principal place of business at 1925 West Main Street, Ephrata, Pennsylvania.

5.  Weaver Nut Company is a distributor of candies, nuts and dried fruits in the wholesale and retail markets.

6.  In the year 2000, Weaver Nut Company was owned exclusively by E. Paul Weaver, III, and Miriam J. Weaver, his wife.

7.  At all times, E. Paul Weaver, III, was the President and sole director of Weaver Nut Company.

8.  In 2000, Weaver Nut Company was in significant financial trouble.

9.  In 2000, Weaver Nut Company was behind on its payments of its loan agreements with its lender, Allfirst Bank.

10.  Weaver Nut Company had entered into multiple forbearance agreements with Allfirst Bank between 2000 and 2001.

11.  In early 2001, Robert Riesner was hired by Weaver Nut Company as Chief Financial Officer to help turn the company's financial situation around.

12.  By letter dated July 18, 2001, Allfirst Bank addressed a letter to Mr. Riesner as Chief Executive Officer of Weaver Nut Company.

13.  Robert Riesner explored numerous options to reduce the debt of Weaver Nut Company.  One option explored was to locate a firm that would acquire an interest in Weaver Nut Company, and assist the Company to pay off the outstanding loans owed to Allfirst Bank.

14.  In April 2001, Mr. Reis became aware of the situation involving Weaver Nut Company through a vendor of Weaver Nut Company, Eagle Food Snacks, through

Eagle's President Akram Choudhry.  Mr. Reis made Mr. Katz aware of the situation regarding Weaver Nut Company.

15.  Mr. Katz operates a company named Summit Private Capital Group, which is a fictitious name under which he does business.

16.  Mr. Katz was interested in the opportunity involving Weaver Nut Company and proceeded to obtain information about the company, met with E. Paul Weaver, III and Robert Riesner, and ultimately proposed an agreement to Mr. Weaver, a Merchant Banking and Corporate Development Agreement between Summit Private Capital Group and Weaver Nut Company.

17.  Weaver Nut Company, through its President E. Paul Weaver, III, entered into the Merchant Banking and Corporate Development Agreement with Summit Private Capital Group through Lawrence J. Katz as Executive Managing Director.

18.  The Merchant Banking and Corporate Development Agreement is dated June 12, 2001.  The agreement was not executed by E. Paul Weaver, III, until July 13, 2001.  Michael Reis also signed the agreement as "CFO Designatee" [sic].[5]

19.  The Company passed a corporate resolution ratifying the  Merchant Banking and Corporate Development Agreement.

20.  Mr. Reis assumed the position of Chief Financial Officer of Weaver Nut Company pursuant to the Merchant Banking and Corporate Development Agreement.

21.  Under the Merchant Banking and Corporate Development Agreement Mr. Reis and Mr. Katz (as Summit) were entitled to a total aggregate compensation amount of $200,000 ($105,000 as a "Financial Management Advisory Fee" to Mr. Reis; $75,000 as a "Financial Management Advisory Fee" to Summit and $10,000 each to

---

[5]     The parties disagree regarding the timing of the signing of the Merchant Banking and Corporate Development Agreement.  The bottom line is that there was a signed agreement between Weaver Nut Company and Summit Private Capital Group that set forth the rights, duties and obligations of each of the participants to the agreement.

Mr. Reis and Summit for expenses).  In addition, Summit was entitled to a percentage commission on financing which it arranged and on strategic acquisitions in which it participated.

22.  Mr. Katz and Mr. Reis each received 500 shares of common stock in Weaver Nut Company equal to a 25% stake each in the Company.[6]

23.  Under the Merchant Banking and Corporate Development Agreement Mr. Reis and Mr. Katz had authority to negotiate on behalf of the Company with various parties including creditors, customers and vendors.  However, neither Mr. Reis nor Mr. Katz had the power to legally bind Weaver Nut Company whatsoever.  They had the power to hire and fire employees only with Company approval.

24.  After execution of the Merchant Banking and Corporate Development Agreement, a sale-lease back was negotiated with William Roberts for the building and real estate occupied by the company.

25.  William Roberts is a real estate investor active in purchasing industrial and commercial properties.

26.  On July 27, 2001, Mr. Roberts purchased for $1,750,000 the building and real estate owned by E. Paul Weaver, III and Miriam Weaver and occupied by Weaver Nut Company.  In addition, Mr. Roberts loaned Mr. and Mrs. Weaver an additional $100,000.  The proceeds of the sale of the building and real estate and additional loan was used to payoff Allfirst Bank.

27.  Mr. Riesner's position at Weaver Nut Company ended when Allfirst Bank was paid off.

28.  In September 2001, Michael Reis began working at Weaver Nut Company.

---

[6]    The record of this case indicates that there have been numerous dates on which Mr. Reis and Mr. Katz allegedly obtained their respective 25% stake in Weaver Nut Company.  For the purposes of this decision, the exact date that each exercised the warrants and were actual owners of a 25% interest in the Company is unimportant.  It is clear from the record, including the corporate tax returns of the Company, that at the end of 2001 both Mr. Reis and Mr. Katz were 25% shareholders in Weaver Nut Company.  Moreover, it is equally clear that both Mr. Reis and Mr. Katz returned their respective shares as part of the settlement with the Weavers.

29. Mr. Reis would be at the company location approximately two weeks a month.

30. Mr. Katz would visit Weaver Nut Company every couple of months, or approximately six to eight times over the entire time he was involved with the Company.

31. With the assistance of Mr. Reis and Mr. Katz, Weaver Nut Company was able to negotiate a line of credit with a company named KBK Financial.

32. The financing obtained from KBK Financial provided Weaver Nut Company a line of credit in excess of $1,000,000. KBK bought Weaver Nut Company receivables on a nonrecourse basis. There was a daily settlement of receivables and customers were instructed to make payments to a lock box controlled by KBK Financial.

33. The financing provided to Weaver Nut Company by KBK Financial was a non-traditional financing arrangement that was more expensive for the company than traditional bank financing.

34. The KBK financing required daily work that was very time consuming and cumbersome for Weaver Nut Company personnel.

35. Mr. Reis hired a number of new employees including Marie Wagner and Dave Fischer. Mr. Reis also hired additional salesmen to attempt to increase sales volume.

36. Marie Wagner was hired as an Office Manager with responsibilities including oversight of the accounts receivable and payable, general accounting, cash management and oversight of the staff and customer service people. Miss Wagner also dealt with the daily reports to KBK Financial. Miss Wagner reported directly to Mr. Reis, but had some contact with E. Paul Weaver, III.

37. In August or September 2002 David Fisher was hired as an inventory control manager of Weaver Nut Company. In January 2003 Mr. Fisher was promoted to general Manager. Mr. Fisher reported directly to Mr. Reis, but was also subordinate to the desires of E. Paul Weaver, III.

38.  Miss Wagner and Mr. Fisher, among others, were hired by Mr. Reis to help eliminate or minimize many unsound business practices that led to Weaver Nut Company's financial problems.

39.  Weaver Nut Company, through E. Paul Weaver, III, had for many years engaged in practices including below cost sales to customers, purchasing without regard to existing inventory and anticipated demand and sale of "out of date" product.

40.  One of the policies instituted to control inventory was a two-signature purchase order policy. Mr. Weaver initially approved the policy, but later resisted the policy and refused to follow it, claiming that he did not approve it.

41.  Mr. Reis was responsible for the day-to-day operations of Weaver Nut Company.  He was responsible for numerous duties, including making sure orders were filled, receivables were timely addressed, inventory was properly adjusted, proper internal controls were established and monitored and generally planning, organizing, staffing, directing and controlling Weaver Nut Company.

42.  Mr. Reis was on-site at Weaver Nut Company approximately two weeks per month.  Mr. Reis delegated many of his responsibilities to others to perform in his absence.

43.  From late 2001 through early 2003 Mr. Katz worked behind the scenes attempting to find new business acquisitions and possible business partners for Weaver Nut Company.

44.  One potential transaction pursued by Mr. Katz involved a possible merger with a company named National Bulk Foods.  No deal was ever consummated with National Bulk Foods.

45.  By the end of calendar year 2002 Weaver Nut Company had returned to profitability with its profit margin rising from approximately 19% to 24.5%. However, the expenses of the company had risen sharply because of the increased costs of Mr. Reis and Mr. Katz, the additional employees who had been hired and the cost of the KBK Financial financing.

46.  Harold Hershey was the long-time accountant
utilized by Weaver Nut Company for its corporate
accounting needs, including preparation of financial
statements, tax returns and other accounting matters.

47.  Early in the tenure of Mr. Reis and Mr. Katz at
Weaver Nut Company, Mr. Hershey expressed to Mr. Weaver
Mr. Hershey's opinion that the Merchant Banking and
Corporate Development Agreement and the KBK financing
were not good for Weaver Nut Company.

48.  Beginning in November 2002 and continuing through
April 11, 2003, significant tensions developed within
the management of Weaver Nut Company.

49.  In that period, the management of Weaver Nut
Company split between those individuals loyal to
E. Paul Weaver, III, and those loyal to Mr. Reis and
Mr. Katz.

50.  A serious dispute arose between Mr. Reis and Mr.
Katz on one side and Mr. Weaver on the other regarding
the two-signature purchasing policy.

51.  Mr. Weaver originally agreed to the two-signature
policy, then later insisted that he never agreed to it
and that his signature approving the policy was either
forged or was placed on the document by using his
signature stamp without his authorization.

52.  Mr. Reis and Mr. Weaver sent contradictory letters
to vendors on the subject of the two-signature policy.
Mr. Weaver sent letters advising vendors that he still
had full authority to make purchases with his signature
alone.  Mr. Reis sent letters indicating that if a
purchase Order did not have two signatures, the
purchase order would not be honored, and the goods
would be returned or not paid for.

53.  The dispute over the two-signature policy resulted
in Mr. Weaver seeking legal advice from attorneys at
defendant Barley Snyder.

54.  On March 26, 2003 Mr. Weaver had an initial
telephone contact with Paul Mattaini, Esquire, a
partner at Barley Snyder.  Barley Snyder did not
represent either E. Paul Weaver, III or Weaver Nut
Company before that date.

-14-

55.  During the telephone call with Attorney Mattaini,
Mr. Weaver discussed the situation at the Company, the
problems as he perceived them, and he gave Attorney
Mattaini a brief description of the Merchant Banking
and Corporate Development Agreement.

56.  At the time Mr. Weaver retained Barley Snyder, he
was the President and sole director of Weaver Nut
Company.

57.  On April 1, 2003 Mr. and Mrs. Weaver, together
with John Maksel, met with Attorneys Mattaini and
Shawn M. Long, of Barley Snyder at the offices of the
firm.

58.  During the April 1, 2003 meeting, Mr. Weaver gave
Attorney Mattaini a brief description of the history of
the company, how Mr. Weaver became involved with Mr.
Reis and Mr. Katz, the situation regarding the
development agreement and what was happening under the
agreement, differences that had developed between
Messrs. Reis and Katz and Mr. Weaver on how the Company
was being run, and how all those issues fit with the
relationship that was ongoing under the development
agreement.

59.  Mr. Weaver expressed a serious concern to Attorney
Mattaini that the mixed messages that were being sent
to customers and vendors were hurting both the short-
and long-term viability of the Company.

60.  Mr. Weaver falsely advised Mr. Mattaini that Mr.
Reis and Mr. Katz were not shareholders in the Company
and that the stock warrants mentioned in the
development agreement had not been exercised by them.

61.  In determining whether to undertake the
representation of Weaver Nut Company and E. Paul
Weaver, III, Attorney Mattaini considered the
applicable provisions of the Pennsylvania Rules of
Professional Conduct including Rule 1.13 and its
comments.  Attorney Mattaini correctly concluded that
the firm was not precluded from representing either or
both parties.

62.  Barley Snyder inquired regarding the corporate
records of Weaver Nut Company with its corporate
counsel Robert Sisko, Esquire, but was advised that

counsel did not have the corporate records being
sought.

63.   Angela Weaver Nolt, Mr. and Mrs. Weaver's
daughter, who was an employee of Weaver Nut Company,
advised Barley Snyder that the box where the corporate
records were stored at Weaver Nut Company had been
moved, and when located, did not contain the corporate
records that had previously been in the box.  Weaver
Nut Company advised Barley Snyder that it did not have
the corporate records requested by Barley Snyder or
copies of them.

64.   Weaver Nut Company employees were unable to find,
and Barley Snyder was unable to review, the corporate
records of Weaver Nut Company because Michael Reis had
removed the corporate records from the premises of
Weaver Nut Company and had placed them in a safe
deposit box at Blue Ball National Bank without the
knowledge or consent of E. Paul Weaver, III.

65.   The corporate records that were removed from
Weaver Nut Company included all the original share
certificates for the Company.

66.   Barley Snyder advised Mr. Weaver that termination
of the Merchant Banking and Corporate Development
Agreement and termination of the employment of Mr. Reis
and Mr. Katz and other employees was an aggressive
strategy which might lead to litigation.  After
consultation with counsel, Mr. Weaver decided that it
was in the best interests of Weaver Nut Company to end
its relationship with Messrs. Reis and Katz and to
terminate the employment of certain employees.

67.   Barley Snyder took direction from Mr. Weaver based
upon his role as President and sole director of Weaver
Nut Company and his assertion that Messrs. Reis and
Katz were not shareholders in the company.

68.   Attorney Mattaini reasonably believed that Barley
Snyder was able to provide competent and diligent
representation to Weaver Nut Company and to Mr. and
Mrs. Weaver at the same time because their interests
were not adverse to one another, based upon Mr.
Weaver's false representations that Messrs. Reis and
Katz were not shareholders.

69.  Barley Snyder did an internal conflict of interest check prior to meeting with the Weavers.

70.  On April 11, 2003, Barley Snyder attorney Shawn M. Long sent a letter to Mr. Reis and Mr. Katz.

71.  The April 11, 2003 letter was copied to Barley Snyder attorneys Paul G. Mattaini, a partner, and Matthew H. Haverstick, an associate.

72.  The April 11, 2003 letter advised Mr. Reis and Mr. Katz that Weaver Nut Company was terminating the Merchant Banking and Corporate Development Agreement together with their employment with Weaver Nut Company.

73.  On April 11, 2003, other Company personnel hired by Mr. Reis, including the office manager (Marie Wagner), the warehouse manager (George Haynes) and the general manager (David Fisher), were fired by E. Paul Weaver, III.

74.  Barley Snyder and its attorneys took action on behalf of the Weavers and Weaver Nut Company without consulting Mr. Reis and Mr. Katz.

75.  Barley Snyder received instructions from Weaver Nut Company through E. Paul Weaver, III, its President and sole director who had legal authority to speak for, and bind, Weaver Nut Company.

76.  On or about April 15, 2003 Messrs. Reis and Katz advised Barley Snyder that together they held 50% of the shares in Weaver Nut Company.  Mr. Weaver disputed this assertion when questioned by Barley Snyder attorneys.  Because the corporate books and records were missing.  Barley Snyder had no means of verifying either position.  Barley Snyder correctly determined that the issue of who owned shares in Weaver Nut Company was in dispute.

77.  On April 15, 2003 a meeting was held between the parties and their counsel to discuss the firing of Mr. Reis, Mr. Katz and the other members of the senior management team.

78.  Mr. Reis and Mr. Katz were both present and were represented at the April 15, 2003 meeting by David C. Schattenstein, Esquire.

79.   During the meeting it was recommended by Attorney Schattenstein that an independent accountant be brought in to take a look at the financial condition of the Company and to make recommendations.

80.   Attorney Schattenstein recommended a number of possible candidates including Frank C. Musso from the Lancaster, Pennsylvania area; the firm of Perini Randolph from Wilmington, Delaware; the firm of Cancannon, Gallagher & Miller from Allentown, Pennsylvania; and the firm of Miller Tate from Philadelphia, Pennsylvania.

81.   The parties agreed to utilize Frank C. Musso because he was closer in proximity to Weaver Nut Company and the costs to the Company for his services would likely be less than from firms that were geographically farther away.

82.   Attorney Schattenstein contacted Mr. Musso who indicated he was available to meet with the parties.

83.   On April 16, 2003 a meeting was conducted at Weaver Nut Company with Mr. Musso, Mr. and Mrs. Weaver, Attorney Schattenstein, Shawn M. Long, Esquire and some other attorneys from Barley Snyder.  Mr. Reis and Mr. Katz were not present at this meeting, but they were represented by Attorney Schattenstein who was.

84.   The beginning of the meeting on April 16, 2003 was very chaotic and Mr. Musso indicated to all those present that he saw no reason for him to be there. After that statement, the others at the meeting seemed to calm down, and the participants began compiling a list of items to be addressed.

85.   By the end of the April 16, 2003 meeting the parties, through their respective counsel, had agreed to retain Mr. Musso.

86.   An engagement letter was sent to counsel for both sides of the dispute.  Both sides approved the engagement letter.  Mr. Weaver specifically signed the letter as President of Weaver Nut Company.  Frank C. Musso, CPA was retained on April 16, 2003 and thereafter undertook an evaluation of Weaver Nut Company.

87.  Mr. Musso was engaged in the business of aiding companies that were having either organizational or financial difficulties and providing these companies with advice on how best to correct their particular situation.

88.  Mr. Musso began a review of the operations of the Company.  On April 23, 2003 Mr. Musso prepared an interim report that made some preliminary recommendations, including replacing the KBK Financial financing and completing the computer system installation, together with identifying a number of inadequacies in administrative discipline and review, internal controls, lack of financial controls and numerous problems with inventory.

89.  On April 24, 2003 Messrs. Reis and Katz called Mr. Musso and expressed their displeasure with not having received a report from him and his not recommending that they and all the other fired employees be brought back.  Messrs. Reis and Katz were very hostile and threatening to Mr. Musso on the telephone call.

90.  Later in the day on April 24, 2003 Attorney Schattenstein faxed a letter to Mr. Musso indicating that Mr. Reis and Mr. Katz were expecting an initial report and answered a question concerning a previous request by Mr. Musso for information.

91.  Between April 25 and April 29, 2009 Attorney Schattenstein stopped representing Mr. Reis and Mr. Katz.

92.  On April 28, 2003 Weaver Nut Company, through E. Paul Weaver, III acting as the sole director of the Company, issued a document entitled Written Consent of Sole Director to Corporate Actions.  The document ratified the actions taken by Mr. Weaver, including termination of the Merchant Banking and Corporate Development Agreement; termination of the employment of Mr. Reis, Mr. Katz and the other fired employees; granting Mr. Weaver additional duties and powers; and ratifying all of his acts for, and on behalf of, the Company.

93.  On April 29, 2003 Mr. Musso advised Mr. Reis and Mr. Katz that, in his view, neither they, nor the other terminated employees should be rehired.

94.   Mr. Musso concluded that Weaver Nut Company was
better off without the Merchant Banking and Corporate
Development Agreement or the employment of Mr. Reis,
Mr. Katz or the fired employees.  Mr. Musso found
numerous deficiencies in the operation of Weaver Nut
Company in areas that were under Mr. Reis' direct
supervision.

95.   On April 29, 2003 Mr. Musso resigned from the
formal written engagement of his services with Weaver
Nut Company dated April 16, 2003.  On that same date,
Mr. Musso initiated a new engagement with the Weavers
and the Company to provide accounting and management
services to them.

96.   On April 30, 2003 an action was commenced in the
Court of Common Pleas of Lancaster County, Pennsylvania
entitled Weaver Nut Company, Inc. et al.v. Summit
Private Capital Group, et al., No. CI-03-03473 seeking
damages for the alleged torts of defamation, tortious
interference with contractual relations and conversion.
On May 1, 2003 the case was removed to the United
States District Court for the Eastern District of
Pennsylvania and was assigned to Senior District Judge
James McGirr Kelly as case number 2003-cv-2815.

97.   On April 30, 2009 Weaver Nut Company and E. Paul
Weaver, III also filed a Petition for Special
Injunction in Lancaster County case number CI-03-03473
seeking, among other things, to enjoin Messrs. Reis and
Katz from communicating with vendors of Weaver Nut
Company, interfering with the operation of the Company
and for the return of all Company books, records and
other property.

98.   On April 30, 2003 a shareholder derivative action
was commenced in the United States District Court for
the Eastern District of Pennsylvania entitled Reis et
al. v. Weaver Nut Company et al, and was assigned to
Judge James McGirr Kelly as case number 2003-cv-2621.

99.   The filing of the shareholder derivative action
created a potential conflict of interest for Barley
Snyder in their joint representation of both Weaver Nut
Company and Mr. and Mrs. Weaver.  Barley Snyder advised
Weaver Nut Company that it would need to secure other
counsel.  Barley Snyder continued to represent Mr. and
Mr. Weaver, individually.

100.  Weaver Nut Company attempted to retain the services of their former corporate counsel Robert Sisko, to no avail.

101.  On May 20, 2003 an attorney not affiliated with Barley Snyder, Christopher S. Underhill, Esquire, met with Mr. Weaver at the offices of Barley Snyder to discuss his possible retention on behalf of Weaver Nut Company.

102.  On May 22, 2003 Attorney Underhill sent an engagement letter to Weaver Nut Company accepting the Company as a client, addressing the scope and purpose of the representation, explaining his purpose as counsel for the Company and attaching his Statement of Fees and Costs and explaining that his law firm would bill the Company on a monthly basis for his services.

103.  On May 23, 2003 Mr. Weaver, as President of Weaver Nut Company, signed the engagement letter indicating his receipt of the letter from Attorney Underhill and agreement to its terms.

104.  Barley Snyder did not represent or provide any legal services or advice to Weaver Nut Company after the company retained Attorney Underhill.

105.  Any transmittal letters from Barley Snyder to Weaver Nut Company containing legal bills for services rendered by Barley Snyder to the Company after May 2003 were an oversight and not indicative that any legal services were actually performed by Barley Snyder on behalf of Weaver Nut Company after that date.

106.  The firm of Barley Snyder and Attorney Underhill's firm, Hartman, Underhill & Brubaker, LLP, are direct competitors in the legal marketplace.

107.  In May 2003 Weaver Nut Company hired John Maksel as the new Chief Financial Officer for the Company, filling the vacancy created when Michael Reis was fired.

108. John Maksel was the person at Weaver Nut Company with whom Attorney Underhill primarily dealt.

109.  E. Paul Weaver, III misunderstood Attorney Underhill's role as counsel for the Company, and Mr.

Weaver erroneously believed that Attorney Underhill was
in the dispute to aid him in Mr. Weaver's individual
capacity.

110.  After being retained by Weaver Nut Company,
Attorney Underhill and John Maksel went to the
Company's accountant to review the financial records of
the Company for the periods both before and after
Messrs. Reis and Katz became involved with the Company.
Attorney Underhill also reviewed, among other things,
the Merchant Banking and Corporate Development
Agreement and the lawsuit instituted by Mr. Reis and
Mr. Katz.

111.  Attorney Underhill indicated that he was willing
to meet with Messrs. Reis and Katz to discuss the
pending litigation and the situation with Weaver Nut
Company after Messrs. Reis and Katz responded to the
discovery requests that Attorney Underhill had
propounded upon them.

112.  From just after their employment was terminated
on April 11, 2003 until early July 2003, Mr. Reis and
Mr. Katz communicated by e-mail, letter and telephone,
derogatory information about E. Paul Weaver, III and
Weaver Nut Company to KBK Financial and to some of the
Company's customers and vendors with the intent to
cripple or destroy the Company's ability to remain in
business without their reinstatement.

113.  Attorney Underhill determined that the
shareholder derivative lawsuit brought by Messrs. Reis
and Katz was not helpful to the Company and would
probably be harmful to the Company.  Attorney Underhill
concluded that Weaver Nut Company should defend the
lawsuit rather than acting on the plaintiff's side.

114.  Attorney Underhill made all of his legal
determinations independently and free of any influence
or coercion from either John Maksel, E. Paul Weaver,
III or Barley Snyder.

115.  After the departure of Messrs. Reis and Katz from
Weaver Nut Company, the Company obtained new financing
from KBK Financial that was more favorable and less
expensive to the Company then the previous KBK
financing had been.

116.   Eventually, Weaver Nut Company obtained more traditional bank financing that was less expensive than the KBK financing.

117.   Overall, the financial program instituted after the departure of Messrs. Reis and Katz, together with the cost savings from the firing of all the employees including Messrs. Reis and Katz, resulted in significant savings to the Company.

118.   The increases in operating costs implemented by Messrs. Reis and Katz offset the increase in gross profit margin that the Company enjoyed during their tenure.

119.   Weaver Nut Company had a gross profit margin of 24.5% in 2002.

120.   Weaver Nut Company maintained a gross profit margin average of 23.08% for the years 2003-2006 after the departure of Messrs' Reis and Katz.

121.   Weaver Nut Company significantly decreased its operating costs after the departure of Messrs. Reis and Katz.

122.   Weaver Nut Company had a net income loss in calendar year 2001 of $101,529.[7]

123.   Weaver Nut Company had a net income loss of $9,103 in calendar year 2002.[8]

124.   Weaver Nut Company had a net income loss of $283,004 in 2003.[9]

125.   Weaver Nut Company had a net income gain of $142,129 in calendar year 2004.

---

[7]   Messrs. Reis and Katz started actively working for the Company in September 2001.

[8]   Messrs. Reis and Katz worked for the Company for the entire year in 2002.

[9]   Messrs. Reis and Katz worked for Weaver Nut Company from January 1, 2003 until they were fired on April 11, 2003.

-23-

126.   Weaver Nut Company had a net income gain of $92,111 for a nine month period in 2005.[10]

127.   Weaver Nut Company had a net income gain of $170,348 in fiscal year 2006.

128.   Weaver Nut Company's sales revenue dropped every year from 2001 until 2005.

129.   Weaver Nut Company's sales increased in 2006.

130.   Despite falling sales, Weaver Nut Company was more profitable in 2004, 2005 and 2006 than it had been in 2001-2003.

131.   Legal bills paid for by Weaver Nut Company to Barley Snyder for services rendered to Mr. and Mrs. Weaver in their individual capacities, were deducted from outstanding loans made by the Weavers to the Company.

132.   E. Paul Weaver, III in his role as President and sole director of Weaver Nut Company owed fiduciary duties to Mr. Reis, Mr. Katz and to Weaver Nut Company.

133.   Mr. Weaver breached his fiduciary duties to Mr. Reis, Mr. Katz and Weaver Nut Company.

134.   Barley Snyder knew that Mr. Weaver owed fiduciary duties to the Company.

135.   Barley Snyder had no knowledge that Mr. Weaver was breaching fiduciary duties to either the Company or to Messrs. Reis and Katz.

136.   On December 15, 2003 all litigation involving Mr. Reis, Mr. Katz, the Weavers and the Company was settled pursuant to a consolidated Settlement Agreement.

137.   As part of the settlement, Messrs. Reis and Katz received a combined $415,000 of which $100,000 was for attorneys' fees.  In addition, under the Settlement Agreement Weaver Nut Company was required to provide

---

[10]     In 2005 Weaver Nut Company converted from a calendar year to a fiscal year for income tax reporting purposes.  Accordingly, a full year net income gain/loss is not available.

health insurance coverage for Messrs. Reis and Katz for a period of one year.

138.  As part of the terms of the Settlement Agreement, Messrs. Reis and Katz were required to return to the Weavers any shares in Weaver Nut Company they may have had.

139.  As part of the settlement, Weaver Nut Company assigned to Mr. Reis and Mr. Katz any claims the Company might have against Weaver Nut Company.

<u>CONCLUSIONS OF LAW</u>

1.  Defendant Barley Snyder did not breach its fiduciary duties to Weaver Nut Company.

2.  Defendant Barley Snyder did not aid or abet the breach of any fiduciary duty owed by E. Paul Weaver, III, to plaintiffs Michael Reis, Sr. or Lawrence J. Katz.

3.  Defendant Barley Snyder did not aid or abet the breach of any fiduciary owed by E. Paul Weaver, III, to Weaver Nut Company.

4.  Defendant Barley Snyder was not negligent in the performance of its professional services to Weaver Nut Company.

5.  Defendant Barley Snyder did not tortiously interfere with Weaver Nut Company's contractual relations with Michael Reis, Sr., Lawrence J. Katz or Summit Private Capital Group.

6.  Defendant Barley Snyder was privileged and legally justified in assisting the termination of the Merchant Banking and Corporate Development Agreement.

7.  Defendant Barley Snyder did not breach its contract for professional services with Weaver Nut Company.

8.  The Merchant Banking and Corporate Development Agreement did not create a joint venture between Weaver Nut Company and Summit Private Capital Group.

9.  Plaintiffs Michael Reis, Sr. and Lawrence J. Katz have not proven by a preponderance of the evidence that they suffered any damages in their individual capacities.

10.  Plaintiffs Michael Reis, Sr. and Lawrence J. Katz have not proven by a preponderance of the evidence that Weaver Nut Company suffered any damages as a result of any actions of defendant Barley Snyder.

11.  Plaintiffs' proposed damages are all speculative and conjectural.

<u>DISCUSSION</u>

<u>Plaintiffs' Claims</u>

As noted above, plaintiffs Michael Reis, Sr. and Lawrence J. Katz seek damages on six separate theories of liability against defendant law firm Barley, Snyder, Senft & Cohen, LLC.

Count I of plaintiffs' Amended Complaint contains three causes of action against defendant Barley Snyder.  They are breach of a fiduciary duty owed to plaintiffs Reis and Katz, as assignees of the rights of Weaver Nut Company; aiding and abetting breach of a fiduciary duty brought by plaintiffs Reis and Katz, individually; and aiding and abetting breach of a fiduciary duty brought by plaintiffs as assignees of the rights of the Company.

Count II asserts a cause of action for professional negligence brought by plaintiffs Reis and Katz as assignees of the rights of the Company.

Count IV alleges a cause of action for tortious interference with contractual relations brought by plaintiffs Reis and Katz as assignees of the rights of the Company

Finally, Count VI avers a cause of action for breach of contract brought by plaintiffs Reis and Katz as assignees of the rights of the Company.  Below, I address each count separately.

### Breach of Fiduciary Duty

Count I of plaintiffs' Amended Complaint asserts a cause of action for breach of fiduciary duty.  Specifically, plaintiffs assert that defendant Barley Snyder breached a fiduciary duty to Weaver Nut Company by representing both the Company and the Weavers.  More specifically, plaintiffs assert that the Merchant Banking and Corporate Development Agreement was for the benefit of the Company and that by aiding the Weavers in terminating the contract, defendant harmed the Company.  In addition, plaintiffs assert that defendant was operating under a conflict of interest in representing both the Company and the Weavers at the same time.

Defendant Barley Snyder contends that it acted pursuant to the direction of E. Paul Weaver, III.  Defendant contends that it believed Mr. Weaver was the President, sole shareholder and founder of Weaver Nut Company.  Defendant contends that Mr. Weaver directed defendant to take action on behalf of the Company against plaintiffs in the interests of saving the Company from

the harm being caused to the Company by plaintiffs.  Furthermore, defendant contends that it acted in good faith, acted in the interests of Weaver Nut Company, and conducted a reasonable investigation into the facts asserted by Mr. Weaver.

Furthermore, defendant contends that there was no potential conflict of interest between the Weavers and the Company until plaintiffs filed their shareholder derivative action on April 30, 2003.  Defendant contends that until April 30, 2003 there was no indication that their representation of both the Weavers and the Company created any possibility of a conflict of interest because until that date both of its clients interests appeared to be aligned with each other.  For the following reasons, I agree with defendant.

The elements which plaintiffs must prove in a claim for breach of a fiduciary duty are:

> (1) that the defendant negligently or intentionally failed to act in good faith and solely for the benefit of plaintiff in all matters for which he or she was employed; (2) that the plaintiff suffered injury; and (3) that the agent's failure to act solely for the plaintiff's benefit...was a real factor in bringing about plaintiff's injuries.

Meyers v. Sudfeld, 2007 U.S.Dist. LEXIS 7634 at *32 (E.D.Pa. Feb. 2, 2007)(Padova, J.) citing McDermott v. Party City Corp., 11 F.Supp.2d 612, 626 n. 18 (E.D.Pa. 1998)(Robreno, J.).

An attorney owes a fiduciary duty to his client which "demands undivided loyalty and prohibits the attorney from

engaging in conflicts of interest, and breach of such duty is actionable." <u>Maritrans GP Inc. v. Pepper, Hamilton & Scheetz</u>, 529 Pa. 241, 253, 602 A.2d 1277, 1283 (Pa. 1992).

Here, defendant relied on the statements of Mr. Weaver who was the President and sole director of the Company.  The information provided by Mr. Weaver included that Mr. Reis and Mr. Katz were acting in ways that were harming to Company; that Mr. Reis had hired numerous employees without Mr. Weaver's consent; that Mr. Reis was contacting vendors and customers regarding the two-signature policy and giving conflicting information regarding who was empowered to make purchasing decisions; that the new employees, the financing with KBK Financial, and the new inventory computer programs were very expensive and unnecessary; and that the Merchant Banking and Corporate Development Agreement together with the actions of Mr. Reis and Mr. Katz were not good for the financial health of the Company.  Mr. Weaver also falsely advised defendant that Messrs. Reis and Katz were not shareholders in the Company.

"An attorney is entitled to rely in good faith upon the statement of facts made to him by his client, and is not under a duty to institute an inquiry for the purpose of verifying his statement before giving advice thereon." <u>Meiksin v. Howard Hanna Company, Inc.</u>, 404 Pa.Super. 417, 424, 590 A.2d 1303, 1306 (1991).  In this case, defendant did attempt to verify the

information provided by Mr. Weaver.  Defendant reviewed the
Merchant Banking and Corporate Development Agreement and it
sought the corporate books and records from both Mr. Weaver and
from corporate counsel, Robert Sisko, Esquire.

However, because Mr. Reis and Mr. Katz removed the
corporate records from the premises of Weaver Nut Company, it was
not possible for Barley Snyder to verify whether the Weavers were
the sole shareholders or if Mr. Reis and Mr. Katz had exercise
the warrants mentioned in the Merchant Banking and Corporate
Development Agreement and were now actually shareholders.

Because it appeared from the information provided to
Barley Snyder by Mr. Weaver that he was acting in the interest of
the Company by seeking to terminate the employment of Mr. Reis,
Mr. Katz, the other employees that were hired by them, and to
terminate the Merchant Banking and Corporate Development
Agreement, there was no negligent or intentional conduct
performed by Barley Snyder in bad faith.

To the contrary, Barley Snyder was permitted to rely on
Mr. Weaver's representations.  The firm conducted a reasonable
investigation based on the materials available to it, and advised
Mr. Weaver that the course of action he was taking, although
lawful, was an aggressive approach which may have a significant
risk of legal action being instituted by the affected parties.
Barley Snyder reasonably relied on the decisionmaking of the

President and sole director of the Company that this aggressive approach was necessary to make sure the Company remained a viable on-going business.

Furthermore, after firing Mr. Reis and Mr. Katz, Barley Snyder participated in having the Company assessed by Mr. Musso and worked closely with Mr. Weaver and the employees of Weaver Nut Company to make the transition as smooth as possible.

After they were fired, Messrs. Reis and Katz informed Barley Snyder that they were both shareholders in the Company. However, Mr. Weaver continued to dispute this contention and Barley Snyder had no means of verification because Mr. Reis and Katz had removed the corporate records.

The contention by Mr. Weaver that Messrs. Reis and Katz were causing harm to the Company was further supported by the independent evaluation performed by Francis C. Musso, CPA, who was retained by the Company at the recommendation of counsel for Messrs. Reis and Katz, David C. Schattenstein, Esquire.

Mr. Musso concluded after investigation, among other things, that the Company was suffering from cash flow and budgeting problems, inventory control problems, lack of internal controls and lack of administrative discipline.  Mr. Musso attributed most of the failures to the failures of Mr. Reis in his role as Chief Financial Officer.  These determinations corroborated the information given to Barley Snyder by Mr. Weaver

regarding the state of affairs at Weaver Nut Company under the direction of Mr. Reis and Mr. Katz.

I find Mr. Musso's testimony on these subjects credible and persuasive in light of the testimony of other witnesses including Mr. Glusman and Attorney Underhill, more fully discussed below.

Finally, I conclude that Barley Snyder took its ethical obligations seriously as evidenced by the fact that when Mr. Reis and Mr. Katz filed their shareholder derivative action, Barley Snyder correctly determined that a possible conflict of interest had arisen which required Weaver Nut Company to seek independent counsel. Barley Snyder first approached former corporate counsel, Robert Sisko, Esquire, who declined to represent the Company. Then, in an effort to help its client Weaver Nut Company, Barley Snyder solicited the help of Christopher S. Underhill, Esquire, who eventually accepted Weaver Nut Company as a client.

As noted in my Findings of Fact, Attorney Underhill engaged in an independent investigation of the facts and circumstances surrounding the situation at Weaver Nut Company and determined that Weaver Nut Company was better off without Mr. Reis, Mr. Katz and the Merchant Banking and Corporate Development Agreement. I find Attorney Underhill's testimony both credible

and persuasive.  Moreover, his conclusions are supported by the similar assessments of Mr. Musso and Mr. Glusman.

Plaintiffs assert that their firing harmed the Company. Rather, I find that their firing helped the Company.

Accordingly, based upon the foregoing, I conclude that plaintiffs have not proven by a preponderance of the evidence that defendant negligently or intentionally failed to act in good faith solely for the benefit of Weaver Nut Company in all matters for with they were employed.  To the contrary, I find the actions of Barley Snyder actually benefitted the Company.

Moreover, I conclude that Barley Snyder was not acting under a conflict of interest during the brief period that they represented both the Company and the Weavers.  Furthermore, Barley Snyder acted in a prudent manner to withdraw from its representation of the Company upon the filing by Mr. Reis and Mr. Katz of a shareholder derivative action.

Regarding the second and third elements, I conclude that there was no failure to act by Barley Snyder that was a factor in bringing about any damage to Weaver Nut Company and that the Company suffered no actual damages.

Regarding damages, plaintiff Katz testified for a number of days regarding his theory of the amount of damages incurred by the Company as a result of the Company's removal of Mr. Reis and Mr. Katz.  To the contrary, defendant's expert

David H. Glusman, CPA testified that Weaver Nut Company suffered
no damages as a result of the firing of Mr. Reis and Mr. Katz.
The parties in this case agree that Pennsylvania does not permit
an award of damages that are merely speculative.  Burtch v. Ganz,
366 B.R. 414, 443 (Bankr. E.D.Pa. 2007) citing Werther v. Rosen,
2003 WL 1861579 at *3 (Phila.Ct.Com.Pl. Apr. 2, 2002)
(Sheppard, J.).  For the following reasons, I conclude that the
testimony of Mr. Katz was purely speculative and that the expert
opinion of Mr. Glusman was credible and persuasive.

Mr. Katz testified regarding his lay opinion regarding
the economic prospects of Weaver Nut Company and its expected
performance with Mr. Reis and Mr. Katz involved in its
management.  I found Mr. Katz's lay opinion unpersuasive.  It was
based upon speculation, such as his projections of (1) a 15%
increase in Company sales each year;[11] (2) a renegotiation of the
Merchant Banking and Corporate Development Agreement to provide
an increase in the contractual income paid by the Company to both
Messrs. Reis and Katz; (3) funds sufficient to buy back the real
estate sold to Mr. Roberts; and (4) the increase in value of that
real estate.

Moreover, I found unpersuasive Mr. Katz's method of
calculating lost profits because it was based upon his

---

[11]     I note that the testimony of Michael Reis Sr. on this same point
was in conflict with that of Mr. Katz.  Mr. Reis testified that he expected a
sales growth of approximately 3% per year.

speculative projections of what the Company's earnings would have
been in the years 2003-2008 if plaintiffs had been involved; and
because of his failure to deduct from the figures the normal
operating expenses of the Company.  I found the testimony of Mr.
Katz on the issue of damages to be self-serving and unconvincing.

        To the contrary, I found persuasive the testimony of
defendant's expert Certified Public Accountant David H. Glusman.
In particular, I concluded that the Company had significant
expenses related to the employment of Mr. Reis and Mr. Katz, the
employment of the additional employees hired by them and the cost
of the KBK financing.  Moreover, the actual financial statements
of the Company indicate that the Company lost money while under
the stewardship of Messrs. Reis and Katz and made money after
they were fired.  Specifically, while the Company's sales were
not as great in 2004-2006, the Company showed an increased profit
in each of those years.

        Thus, based in part on the testimony of Mr. Glusman,
the financial statements of Weaver Nut Company, and my assessment
of the testimony of Mr. Katz, I conclude that plaintiffs failed
to establish by a preponderance of the evidence that Weaver Nut
Company suffered any damage at all.  I fact, I conclude that
Weaver Nut Company financially prospered after the firing of Mr.
Reis and Mr. Katz.

Accordingly, I conclude that plaintiffs, as assignees of the rights of Weaver Nut Company, have not proven by a preponderance of the evidence that defendant Barley Snyder breached a fiduciary duty owed to Weaver Nut Company.  Hence, I enter judgment on this aspect of Count I of plaintiffs' Amended Complaint in favor of defendant Barley Snyder and against plaintiffs Reis and Katz, as assignees of the rights of Weaver Nut Company.

<u>Aiding and Abetting</u>

Count I of plaintiffs' Amended Complaint contains a claim of aiding and abetting the breach of a fiduciary duty brought by plaintiffs Katz and Reis, both individually and as assignees of the claims of the Company.  Specifically, plaintiffs assert that defendant Barley Snyder aided and abetted the breach of fiduciary duties owed by E. Paul Weaver, III to plaintiffs Michael Reis, Sr. and Lawrence J. Katz, individually as shareholders of Weaver Nut Company.  In addition, plaintiffs claim that defendant aided and abetted Mr. Weaver in breaching fiduciary duties owed to the Company.  I note that plaintiffs have not asserted exactly what fiduciary duties Mr. Weaver allegedly violated.  However, based upon the evidence presented at trial, I am able to divine plaintiffs' intent.

Defendant contends that there is no evidence that Mr. Weaver breached any fiduciary duty to Mr. Reis and Mr. Katz or to

the Company.  In addition, defendant contends that there is no evidence that Barley Snyder had knowledge of any breach of fiduciary duties by Mr. Weaver or that it substantially assisted or encouraged him to do so.

For the following reasons, I conclude that E. Paul Weaver, III did breach his fiduciary duties to both Mr. Reis and Mr. Katz, as well as his fiduciary duties to the Company. However, I conclude that plaintiffs have not proven by a preponderance of the evidence that Barley Snyder either had knowledge of the breach or provided substantial assistance or encouragement to Mr. Weaver.

The elements that must be proved in order to maintain a claim for aiding and abetting a breach of fiduciary duty are: (1) a breach of a fiduciary duty owed to another; (2) knowledge of the breach by the aider and abettor; and (3) substantial assistance or encouragement by the aider and abettor in effecting that breach.  Pierce v. Rossetta Corporation, 1992 U.S.Dist. LEXIS 9065 (E.D.Pa. June 15, 1992)(Dubois, J.); Koken v. Steinberg, 825 A.2d 723 (Pa.Commw. 2003).

A director of a corporation stands in a fiduciary relation to the corporation and has a legal obligation to the corporation to perform his duties as a director in good faith and in a manner he reasonably believes to be in the best interest of the corporation.  The director must use such care, including

reasonable inquiry, skill, and diligence, as a person of ordinary prudence would use under similar circumstances.  See 15 Pa.C.S.A. § 1712(a).

In addition, "[a] director shall not be considered to be acting in good faith if he has knowledge concerning the matter in question that would cause his reliance to be unwarranted. 15 Pa.C.S.A. § 1712(b).  Inherent in the fiduciary duties owed by a director are a duty of loyalty, of good faith and to avoid self-dealing.

E. Paul Weaver, III, was the sole director of Weaver Nut Company.  As such, he owed fiduciary duties to the corporation.  In my Findings of Fact above, I conclude that Mr. Weaver falsely stated to Barley Snyder that Mr. Reis and Mr. Katz were not shareholders of the Company.  Mr. Weaver, as President and sole director would have actual knowledge of the corporate tax returns filed for tax years 2001 and 2002 that clearly show that both Mr. Reis and Mr. Katz were shareholders for the purposes of the federal income tax laws in both of those calendar years.  Thus, it was a false statement by Mr. Weaver to tell Barley Snyder that plaintiffs Reis and Katz were not shareholders.  This false statement violates the duty of good faith as well as the intent of 15 Pa.C.S.A. § 1712(b).  Moreover, I find that Mr. Weaver signed both plaintiffs' share certificates, and that his statements to the contrary were false.

I also conclude that, in addition to his stated purpose of protecting Weaver Nut Company from Messrs. Reis and Katz, Mr. Weaver was also acting in his own self-interest and violating his duty of loyalty to both the corporation and its shareholders. Thus, I conclude that E. Paul Weaver, III, did breach a fiduciary duty owed to Mr. Reis and Mr. Katz, individually and to Weaver Nut Company.

Regarding the second element of a claim for aiding and abetting a breach of fiduciary duty, I conclude that Barley Snyder had no knowledge of the breach of fiduciary duties by Mr. Weaver. Specifically, plaintiffs have failed to establish by a preponderance of the evidence that Barley Snyder had any such knowledge. Mr. Weaver falsely stated to Barley Snyder that Messrs. Reis and Katz were not shareholders. Barley Snyder attempted to investigate this assertion but was unable to confirm or deny the assertion. Even when presented with the assertion of stock ownership by Messrs. Reis and Katz, Barley Snyder was still not able to confirm this because plaintiffs had secreted the corporate books and records away from the Company.

However, Mr. Weaver was not acting solely in his own interest. His actions reveal that the termination of Mr. Reis, Mr. Katz and the Merchant Banking and Corporate Development Agreement was in the Company's best interest. This conclusion is supported by the testimony of Mr. Musso, Mr. Underhill and

Mr. Glusman which I found persuasive and credible.  More
specifically, Weaver Nut Company performed better after the
termination of Messrs. Reis and Katz than while they were
involved with the Company.  Accordingly, I conclude that Barley
Snyder had no knowledge of the breach of fiduciary duties by
E. Paul Weaver, III.

      Next, whether the actions of Barley Snyder can be
viewed as giving substantial assistance or encouragement to Mr.
Weaver in effecting the breach is a more difficult question.  The
firm's actions in aid of Mr. Weaver and the Company did result in
the termination of the employment of Mr. Reis and Mr. Katz.
However, it did not terminate any rights they each had as
shareholders.  Those rights remained in effect until they both
returned any shares they possessed to the Weavers and the Company
as a result of their Settlement Agreement.  Under that agreement,
plaintiffs were compensated for all their rights as shareholders
and their contract rights pursuant to the Merchant Banking and
Corporate Development Agreement.

      Because Barley Snyder was not aware of any breach of
fiduciary duties on the part of Mr. Weaver, and because its
conduct did not fall outside the normal provision of legal
services to either the Weavers or the Company, I conclude that
Barley Snyder did not provide substantial assistance or
encouragement in effecting the breach by Mr. Weaver.  Stated

differently, Barley Snyder did nothing to encourage Mr. Weaver to falsely state the status of shareholders in Weaver Nut Company, or to assist him in doing so.

Accordingly, I conclude that plaintiffs have failed to prove by a preponderance of the evidence their claims of aiding and abetting the breach of a fiduciary duty, either individually, or as assignees of the claim of the Company.  Thus, I grant judgment in favor of defendant Barley Snyder and against plaintiffs on that count.

<u>Professional Negligence</u>

In Count II, plaintiffs' Amended Complaint alleges a cause of action for professional negligence against defendant Barley Snyder in its representation of the Company, brought by plaintiffs Reis and Katz as assignees of the rights of the Company.  Specifically, plaintiffs allege that Barley Snyder had a conflict of interest in representing both Mr. Weaver and the Company and that this conflict caused harm to the Company.

More specifically, the Company asserts that Barley Snyder did not exercise adequate due diligence in determining whether a conflict of interest would occur and alleges that attorneys of ordinary skill and knowledge would have done so. Furthermore, plaintiffs contend that because of defendant's negligence, the Company was damaged and that defendant's

negligence was the proximate cause of the Company's damages.
Defendant denies these allegations.

There are three elements of a cause of action for
professional negligence: "(1) the employment of the attorney or
other basis for his duty to act as an attorney; (2) the failure
of the attorney to exercise ordinary skill and knowledge; and
(3) that such negligence was the proximate cause of damage to the
plaintiff." Ibn-Sadiika v. Reister, 380 Pa.Super. 397, 403,
551 A.2d 1112, 1115 (Pa.Super. 1988)(citations omitted).  Expert
testimony is required to establish the relevant standard and
whether defendant complied with that standard. Lentino v. Fringe
Employee Plans, Inc., 611 F.2d 474, 480 (3d Cir. 1979) citing
Chandler v. Cook, 438 Pa. 447, 265 A.2d 794 (1970); Lambert v.
Soltis, 422 Pa. 304, 221 A.2d 173 (1966).

Here both plaintiffs and defendant proffered the
testimony of expert witnesses on the issue of whether Barley
Snyder committed professional negligence in its representation of
Weaver Nut Company.  Plaintiffs offered the testimony of
Professor Geoffrey C. Hazard, Jr., who was qualified as an expert
in the field of standards of professional legal conduct.
Defendant offered the testimony of Thomas G. Wilkinson, Jr., who
was qualified as an expert in the field of lawyer professional
standards.  Both experts come to the court with very impressive

credentials and both were very knowledgeable and helpful in their presentations to the court.

Professor Hazard opined that the relationship between the Weavers and Weaver Nut Company on one hand, and Messrs. Reis and Katz, together with Summit Private Capital Group, on the other was one of a joint venture.  I disagree.

Because Weaver Nut Company was an existing Company and because Mr. Reis and Mr. Katz did not share control of the Company with Mr. Weaver, the parties cannot be deemed to have been involved in a joint venture.

> To constitute a joint venture, certain factors are essential:
>
> 1) each party to the venture must make a contribution, not necessarily of capital, but by way of services, skill knowledge, materials or money;
>
> 2) profits must be shared among the parties;
>
> 3) There must be a joint proprietary interest and a right of mutual control over the subject matter of the enterprise; [and]
>
> 4) Usually, there is a single business transaction rather than a general and continuous transaction.

Keeler v. International Harvester Used Truck Center, 317 Pa.Super. 244, 246-247, 463 A.2d 1176, 1178 (Pa.Super. 1983) citing McRoberts v. Phelps, 391 Pa. 591, 138 A.2d 439 (1958).

Here, the Merchant Banking and Corporate Development Agreement specifically provided that Mr. Reis and Mr. Katz did not have the mutual right of control the subject matter of the

enterprise (the Company).  Moreover, the venture was limited to single endeavor or transaction but would continue for an unspecified and indefinite time period.  Thus, I conclude that the relationship between the Weavers, Weaver Nut Company, Mr. Reis, Mr. Katz and Summit Private Capital Group was not a joint venture.

The professional standards of due care which Professor Hazard opined were breached by defendant lawyers, were the standards applicable to commercial lawyers representing clients involved in a joint venture.  Because the factual basis for Professor Hazard's opinions was that the relationship of the parties was a joint venture, and because I have rejected that factual premise, I do not credit Professor Hazard's opinions.  As a result, I conclude that plaintiffs have not sustained their burden of proof on this claim.

On the other hand, I conclude that there is a sufficient factual basis to support the opinions of Attorney Wilkinson that Barley Snyder did not breach the applicable standard of professional care under the circumstances of this case.  I found his opinions to be both credible and persuasive. As a result I find that defendant did not fail to exercise reasonable professional skill and knowledge in its representation of Weaver Nut Company.

As noted above, I have already concluded regarding plaintiffs' claim for breach of fiduciary duty that defendant Barley Snyder did not operate under a conflict of interest in its representation of Weaver Nut Company.  Moreover, I concluded that there were no damages.  Thus, notwithstanding the expert testimony provided by the parties, I conclude that plaintiffs have not established by a preponderance of the evidence that defendant Barley Snyder committed professional negligence in its representation of Weaver Nut Company.

Accordingly, I grant judgment in favor of defendant and against plaintiffs on Count II of plaintiff's Amended Complaint.

<u>Tortious Interference With Contractual Relations</u>

Count IV of plaintiffs' Amended Complaint avers a cause of action for tortious interference with contractual relations brought by plaintiffs Reis and Katz as assignees of the Company. Plaintiffs aver that defendant acted outside the normal scope of the attorney/client relationship based upon a conflict of interest in representing both the Weavers and the Company and because of Barley Snyder's own self-interest in obtaining large attorneys' fees in representing the Company.

Defendant denies plaintiff's contentions.

To state a claim for tortious interference with contractual relations a plaintiff must allege: (1) the existence of a contract; (2) purposeful action by the defendant

specifically intended to harm the existing relation; (3) absence
of privilege or justification on the part of the defendant; and
(4) actual legal damage as a result of defendant's conduct.
CAT Internet Services, Inc. v. Magazines.com, Inc.,
2001 U.S.Dist. LEXIS 8 at *14 (E.D.Pa. Jan. 4, 2001)(Padova, J.)
citing Shiner v. Moriarty, 706 A.2d 1228, 1238 (Pa.Super. 1998).
Pennsylvania law recognizes a tortious interference claim only
where defendant has interfered with a plaintiff's contract with a
third party.  Center for Concept Development, LTD., v. Godfrey,
1999 U.S.Dist.LEXIS 3337 at *6 (E.D.Pa. Mar. 23, 1999)
(Hutton, J.).

          Defendant contends that plaintiffs cannot prevail
because the actions of an attorney who is acting to protect the
legal interests of his client are privileged for purposes of a
claim for tortious interference with contractual relations.

          Plaintiffs aver that defendant's actions were not
privileged with respect to the Company.  Specifically, plaintiffs
as assignees of the Company, allege that because Barley Snyder
represented both Mr. Weaver and the Company, it was required to
ensure that it did not harm the contractual relations of either
of its clients.  Plaintiffs allege that what Mr. Weaver believed
to be in his interest was not in the interest of the Company.

          Regarding the elements of this tort, it is clear that
there was a contract (the Merchant Banking and Corporate

Development Agreement).  Thus, plaintiffs have satisfied the
first element of their claim.

Next, plaintiffs must prove that there was purposeful
action by the defendant specifically intended to harm the
existing relation.  As noted above, plaintiffs Reis and Katz sit
in the shoes of the Company based upon the assignment of the
Company's rights.  "It is hornbook law that a party...to a
contract cannot interfere with its own contracts."  Godfrey,
1999 U.S.Dist.LEXIS 3337 at *6-*7.  It is as equally well-settled
that a corporate entity and its agents are not distinct parties
for contracting purposes because a corporation is a creature of
legal fiction which may only act through its officers, directors
and agents.  Godfrey, 1999 U.S.Dist. LEXIS 3337 at *7.

Therefore, a corporation's agents cannot tortiously
interfere with the corporation's contracts when the agents'
conduct occurs within the scope of employment.  Labalokie v.
Capital Area Intermediate Unit, 926 F.Supp. 503, 509 (M.D.Pa.
1996)(Rambo, J.)(Citations omitted).  In addition, attorneys are
normally recognized as agents for their clients and are deemed to
be the same party as their clients when performing their duties
as lawyers within the course and scope of that representation.
See e.g. Heffernan v. Hunter, 189 F.3d 405, 413 (3d Cir. 1999).

Here, I have already concluded that defendant Barley
Snyder did not act under a conflict of interest and that the

representation of both the Weavers and Weaver Nut Company was
proper.  Thus, Barley Snyder was an agent of Weaver Nut Company
when it, pursuant to its clients directive, sought to terminate
the Merchant Banking and Corporate Development Agreement.
Because plaintiffs sit in the shoes of Weaver Nut Company as
assignees and Barley Snyder sits in the shoes of Weaver Nut
Company as its agent, Weaver Nut Company cannot tortiously
interfere with its own contract.

Defendant did not take any purposeful action
specifically intended to harm the existing relation.  Rather, it
was the Company that took the action.  Because the Company is the
equivalent of the plaintiffs for this purpose, plaintiffs have
failed to prove the second element by a preponderance of the
evidence.

Regarding the third element of privilege or
justification, "[c]ourts have recognized a broad privilege which
protects attorneys from being sued by third parties as a
consequence of the advice they give their clients in good faith."
Trustees of the International Brotherhood of Electrical Workers
Local 98 Pension Plan v. Aetna Casualty & Surety Company,
1998 U.S. Dist. LEXIS 14605 at *9 (E.D.Pa. Sept. 14, 1998)
(Waldman, J)(Citations omitted.)  However, there are limits to
the privilege when "the attorney's conduct consisted of 'self-

interested activity' beyond the proper scope of the practice of law."  1998 U.S. Dist. LEXIS 14605 at *10.

In this case, I have already concluded that defendant did not operate under a conflict of interest.  Moreover, if it is true that an attorney acts in self-interest if he accepts a client who has the ability to pay for the attorney's services, then every attorney/client relationship would be marred by the attorney's self-interest, except in those cases taken by on a pro bono basis.  Here, plaintiffs have provided no evidence that defendant Barley Snyder acted inappropriately in any way during its representation of Weaver Nut Company.

Moreover, I conclude that Barley Snyder was justified and privileged to give Weaver Nut Company advice regarding the Merchant Banking and Corporate Development Agreement, including opinions regarding the negative consequences of terminating the agreement.

Accordingly, I conclude that defendant was both justified and privileged in the actions and advice it provided during the representation of Weaver Nut Company.

Finally, on the issue of damages, as noted above, I conclude that plaintiffs have not proven any damages by a preponderance of the evidence.  Specifically, with regard to this claim for tortious interference with contractual relations I again conclude that Weaver Nut Company was better off without the

Merchant Banking and Corporate Development Agreement.  Thus, the Company was in no way damaged.

Accordingly, I grant judgment in favor of Barley Snyder and against plaintiffs Reis and Katz as assignees of the Company on Count IV of plaintiffs' Amended Complaint.

<u>Breach of Contract</u>

Count VI of plaintiffs' Amended Complaint alleges breach of contract for the professional services rendered by Barley Snyder to Weaver Nut Company, brought by plaintiffs Reis and Katz in their capacity as assignees of the rights of the Company.  Specifically, plaintiffs assert that defendant breached the contract by operating under a conflict of interest in the dual representation of the Weavers and the Company.

The elements of a breach of contract claim include: (1) the existence of a contract, including its essential terms; (2) a breach of a duty imposed by the contract; and (3) resultant damages.  <u>Gorski v. Smith</u>, 812 A.2d 683 (Pa.Super. 2002). Although defendant did not produce a written representation agreement, nevertheless tha parties' course of dealing clearly establish that they had an attorney-client relationship.  <u>See Meyers v. Sudfeld</u>, 2007 WL 419182 (E.D.Pa. Feb. 2, 2007) (Padova, J.).

A claim for breach of the attorney-client agreement

> is a contract claim and the attorney's liability
> in this regard will be based on the terms of that
> contract.  Thus, if an attorney agrees to provide
> his or her best efforts and fails to do so an
> action will accrue.  Of course an attorney is by
> implication agreeing to provide that client with
> professional services consistent with those
> expected of the profession at large.

Bailey v. Tucker, 533 Pa. 237, 251-252, 621 A.2d 108, 115
(Pa. 1993).

Here, plaintiffs have established the existence of a
contract.  Defendant does not dispute that it was hired to
perform services for Weaver Nut Company.  However, plaintiffs'
sole contention is that the services provided by Barley Snyder to
the Company were provided while defendant was operating under a
conflict of interest.  I have previously determined above that no
conflict of interest was present during the representation of
Weaver Nut Company.  Thus, I conclude that there was no breach of
any duty owed to the Company.

Moreover, I also determined that the Company has not
suffered any damages in this case.  Hence, the final element is
not satisfied.

Thus, because plaintiffs have failed to prove by a
preponderance of the evidence that there was either a breach of a
duty imposed by the contract at issue or any damages resulted
therefrom, I conclude that plaintiffs fail to prove a cause of
action of breach of contract.

Accordingly, I grant judgment in favor of defendant Barley Snyder and against plaintiffs Reis and Katz in their capacity as assignees of the rights of Weaver Nut Company on Count VI of plaintiffs' Amended Complaint.

<u>CONCLUSION</u>

For the reasons expressed above, I find in favor of defendant Barley, Snyder, Senft & Cohen and against plaintiffs Michael Reis, Sr. and Lawrence J. Katz, individually, and as assignees of the rights of Weaver Nut Company on Counts I, II, IV and VI of plaintiffs' Amended Complaint.[12]

---

[12]   All other counts of plaintiff's Amended Complaint were dismissed by my Order and Opinion dated March 30, 2007 and amended April 2, 2007 granting defendant's motion to dismiss.